Elise R. Sanguinetti (CSB #191389)
  elise@asstlawyers.com
Alfredo Torrijos, Esq. (CSB #222458)
  alfredo@asstlawyers.com
**ARIAS SANGUINETTI STAHLE & TORRIJOS, LLP**
6701 Center Drive West, 14th Floor
Los Angeles, CA 90045
Tel: (310) 844-9696
Fax: (310) 861-0168

Jay A. Urban (*Pro Hac Vice* to be submitted)
  jurban@wisconsininjury.com
**URBAN & TAYLOR S.C.**
4701 North Port Washington Road
Milwaukee, WI 53212
Tel: (414) 906-1700
Fax: (414) 906-5333

*Attorneys for Plaintiff*
*and the Proposed Class*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| JOHN STRINGER, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>  vs.<br><br>COMBE, INC.; COMBE PRODUCTS, INC.; COMBE LABORATORIES, INC.; and COMBE INTERNATIONAL, LTD.,<br><br>    Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiff John Stringer ("Plaintiff"), individually and on behalf of all others similarly situated, makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiff and his counsel, which are based on personal knowledge.  Plaintiff brings this action for restitution and monetary damages against defendants Combe, Inc., Combe Products, Inc., Combe Laboratories, Inc., and Combe International, Ltd. (collectively referred to as "Defendants"), demanding a trial by jury.

## NATURE OF THE ACTION

1.      Plaintiff, an African American, brings this civil rights action on behalf of himself and all others similarly situated against Defendants for violation 42 U.S.C. § 1981, which prohibits race discrimination in the making and performance of contracts. Defendants' knowing concealment of material facts concerning the safety of their product for use by African Americans also runs afoul of the California Legal Remedies Act ("CLRA") and the California Unfair Competition Law ("UCL").

2.      Defendants manufacture the well-known hair dye product line Just For Men®. Over the past decade, Defendants launched a targeted marketing campaign headlined by legendary Black sports figures to induce African American males to purchase their products.  Defendants engaged in this racially motivated conduct despite knowing that: (1) the Just For Men® Jet Black color shade intended for African American consumers contained seventeen times more p-Phenylenediamine ("PPD") – a remarkable "strong sensitizer" with the potential to cause severe health risks – than lighter color shades intended for White consumers, and (2) the sensitization rate to PPD is fives times greater for African American males than White males.  In the face of this unacceptable risk disparity between the races, Defendants neglected to warn or disclose that African American males had a significantly heightened propensity for severe physical injury or that the Jet Black color shade was unreasonably dangerous.

3.      Defendants' discriminatory, fraudulent and unfair business practices prevented Plaintiff from making an informed decision and unfairly diminished his ability to come to a meeting of the minds contractually with the Defendants prior to making his purchase.  The

purchase transaction lacked good faith and fair dealing, and as a result Plaintiff sustained severe physical and other injuries.  For himself individually and on behalf of the Nationwide Class and the California Class (collectively the "Classes") he seeks to represent, Plaintiff now requests damages, restitution, declaratory and injunctive relief and all other remedies deemed appropriate by this Court to make him whole and deter and prevent Defendants from engaging in similar intentional, illicit conduct against African Americans in the future.

## JURISDICTION AND VENUE

4.     This action arises under 42 U.S.C. § 1981, and jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4).

5.     This Court has supplemental jurisdiction over California statutory claims pursuant to 28 U.S.C. § 1367.

6.     Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332(d)(2) as, upon information and belief, the aggregated claims of the individual class members exceed $5,000,000, exclusive of interest and costs, at least one class member is of diverse citizenship from one defendant, and there are more than 100 class members.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, as Plaintiff resides in this District, the underlying purchase transaction took place in the District and Defendants do business in the District, specifically the sale and distribution of Just For Men® products.

## PARTIES

8.     Plaintiff, Mr. Stringer, is an adult resident of the State of California currently residing in Oakland, California.

9.     Defendant Combe, Inc., is a Delaware corporation with its principal place of business at 1101 Westchester Avenue, White Plains, New York 10604.

10.     Upon information and belief, at all times relevant hereto, Defendant Combe, Inc., was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Just For Men® hair care and dye

**CLASS ACTION COMPLAINT**

products.

11.    Upon information and belief, at all times relevant hereto, Defendant Combe, Inc., was present and doing business in the city of Oakland, the State of California.

12.    Upon information and belief, at all times relevant hereto, Defendant Combe, Inc., transacted, solicited, and conducted business in the State of California and the city of Oakland, and derived substantial revenue from such business.

13.    Upon information and belief, at all times relevant hereto, Defendant Combe, Inc., expected or should have expected that its acts would have consequences within the United States of America, the State of California, and the city of Oakland.

14.    Defendant Combe International, Ltd., is a Delaware corporation with its principal place of business at 1101 Westchester Ave., White Plains, New York 10604.

15.    Upon information and belief, at all times relevant hereto, Defendant Combe International, Ltd., was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Just For Men® hair care and dye products.

16.    Upon information and belief, at all times relevant hereto, Defendant Combe International, Ltd., was present and doing business in the city of Oakland, the State of California.

17.    Upon information and belief, at all times relevant hereto, Defendant Combe International, Ltd., transacted, solicited, and conducted business in the State of California and the city of Oakland, and derived substantial revenue from such business.

18.    Upon information and belief, at all times relevant hereto, Defendant Combe International, Ltd., expected or should have expected that its acts would have consequences within the United States of America, the State of California, and the city of Oakland.

19.    Defendant Combe Products, Inc., is a Delaware corporation with its principal place of business at El Duque Und Park Rr 971, Naguabo, Puerto Rico 00718.

20.    Upon information and belief, at all times relevant hereto, Defendant Combe Products, Inc., was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Just For Men® hair care

**CLASS ACTION COMPLAINT**

and dye products.

21.     Upon information and belief, at all times relevant hereto, Defendant Combe Products, Inc., was present and doing business in the city of Oakland, the State of California.

22.     Upon information and belief, at all times relevant hereto, Defendant Combe Products, Inc., transacted, solicited, and conducted business in the State of California and the city of Oakland, and derived substantial revenue from such business.

23.     Upon information and belief, at all times relevant hereto, Defendant Combe Products, Inc., expected or should have expected that its acts would have consequences within the United States of America, the State of California, and the city of Oakland.

24.     Defendant Combe Laboratories, Inc., is a Delaware corporation that has its principal place of business at 200 Shellhouse Drive, Rantoul, IL 61866.

25.     Upon information and belief, at all times relevant hereto, Defendant Combe Laboratories, Inc., was engaged in the business of designing, developing, manufacturing, testing, packaging, promoting, marketing, distributing, labeling, and/or selling Just For Men® hair care and dye products.

26.     Upon information and belief, at all times relevant hereto, Defendant Combe Laboratories, Inc., was present and doing business in the city of Oakland, the State of California.

27.     Upon information and belief, at all times relevant hereto, Defendant Combe Laboratories, Inc., transacted, solicited, and conducted business in the State of California and the city of Oakland and derived substantial revenue from such business.

28.     Upon information and belief, at all times relevant hereto, Defendant Combe Laboratories, Inc., expected or should have expected that its acts would have consequences within the United States of America, the State of California, and the city of Oakland.

## **FACTUAL ALLEGATIONS**

29.     Just For Men® is a cosmetic hair care and dye product line intended to improve and alter hair and facial hair color.

30.     Defendants have developed, designed, formulated, manufactured, packaged,

**CLASS ACTION COMPLAINT**

labeled, advertised, marketed, instructed on, distributed and sold Just For Men® hair care and dye products across California and the United States since at least 1987.

31.     Defendants, the self-proclaimed "champions of facial hair," boast that Just For Men® products are backed by "three decades of research and have delivered great results over 50 million times."

32.     By 2001, Just For Men® accounted for approximately 70% of the retail men's hair coloring product market.

33.     Under the Federal Food, Drug and Cosmetic Act (FFDCA), 21 U.S.C. § 361; FFDCA § 601, Just For Men® hair and facial hair dye products are recognized as coal-tar hair dyes.  Because of this classification, Defendants' products are exempt from FDA approval prior to consumer use, and the FDA is prohibited from taking legal action against Defendants for safety issues related to the products so long as the packaging includes a generic caution statement noting that the products "contain ingredients which may cause skin irritation" and a skin test recommendation.

34.     On several occasions, the FDA unsuccessfully argued for repeal of the coal-tar exemption because of potential health hazards. *See FDA Regulation of Cosmetics and Personal Care Products*, Congressional Research Service (July 9, 2012).

35.     Despite Congressional handcuffs, FDA publications regarding coal-tar hair dyes recognize that one product ingredient in particular, p-Phenylenediamine ("PPD"), "has been implicated more prominently in leading to allergic reactions."

**Phenylenediamine**

36.     Defendants used p-Phenylenediamine ("PPD") as an ingredient in their Just For Men® hair and facial hair dye products.

37.     PPD is an organic aromatic amine chemical compound that, when exposed to an oxidizing agent, produces a dark color pigment.

38.     Beyond being a dye component, PPD is utilized in the manufacture of rubber tires, as an additive to gasoline and as a photographic developing agent.

39.     Human exposure to PPD is hazardous and associated with potentially severe health

1    risks.

2          40.    The United States Environmental Protection Agency ("EPA") has identified links

3    between PPD and several acute and chronic injuries including but not limited to:

4                 a.    Severe dermatitis;

5                 b.    Renal failure;

6                 c.    Gastritis;

7                 d.    Acute contact dermatitis;

8                 e.    Eczematoid contact dermatitis;

9                 f.    Asthma;

10                g.    Vertigo;

11                h.    Tremors;

12                i.    Convulsions; and

13                j.    Comas.

14   U.S. Environmental Protection Agency, *p-Phenylenediamine Hazard Summary*, 106-50-3 (Jan.

15   2000).

16         41.    Further, the United States Consumer Product Safety Commission ("CPSC") flagged

17   PPD as one of only five substances requiring the cautionary designation of "strong sensitizer".  16

18   CFR 1500.13.

19         42.    To qualify as a strong sensitizer, the CPSC must determine through reliable medical

20   and scientific evidence that a substance has "significant potential for causing hypersensitivity".

21   At minimum, the human reaction to the substance must be "clinically important" and have a

22   "significant impact on quality of life". 16 CFR 1500.13(c)(5)(ii)(A-E).

23         43.    Because of increased exposure and hypersensitivity to PPD in the general

24   population, the American Contact Dermatitis Society declared PPD the "Allergen of the Year" in

25   2006.

26         44.    An abundance of scholarly journals and media reports acknowledge the significant

27   risks associated with PPD exposure and have noted severe and sudden allergic reactions, including

28   serious skin irritation, anaphylaxis, and even death.

**CLASS ACTION COMPLAINT**

45.     PPD sensitization rates are significantly higher for African Americans than Whites.

46.     A scientific study by the Cleveland Clinic concluded that the sensitization rate to PPD in Black men was 21.2% compared to only 4.2% in White men.  **Exhibit A** – Dickel et al., *Comparison of Patch Test Results With a Standard Series Among White and Black Racial Groups*, American Journal of Contact Dermatis, Vol.12, No.2 (June, 2001).

47.     PPD is now known as one of, if not the most, common allergens in the African American population, even rivaling nickel, which is the leading cause of Allergic Contact Dermatitis ("ACD") in the world.

48.     The extreme disparity in PPD sensitization rates between African Americans and Whites is well noted in scholarly journals and by the media.

**Jet Black**

49.     Just For Men® hair dye products, in particular the Original Formula and the Mustache & Beard box kits, are sold in a spectrum of color shades, ranging from Blonde to Jet Black.

50.     Upon information and belief, Defendants used different amounts of PPD in the various color shades of their Just For Men® hair dye products.

51.     Upon information and belief, the amount of PPD used by Defendants in the Jet Black color shade was approximately 17 times greater than the amount of PPD used in lighter color shades.

52.     Upon information and belief, the overwhelming majority of consumers buying and using the Jet Black color shade are African American.

53.     Upon information and belief, Defendants possess information on product design, testing and consumer reports evidencing sensitization and adverse reactions by African American males to the Jet Black color shade.

54.     Upon information and belief, Defendants operate an internal claims process that seeks liability releases from injured consumers to conceal problems associated with Just For Men® products, including cases involving sensitization and adverse reactions by African American males to the Jet Black color shade.

**CLASS ACTION COMPLAINT**

55.     Despite PPD's designation as a "strong sensitizer" and a history of consumer complaints, Defendants failed to warn and concealed the significantly higher amount of PPD in the Jet Black color shade compared to lighter color shades of the same product.

56.     Defendants failed to warn and concealed that the Jet Black color shade exposed African American males to a significantly increased risk of potentially severe health risks compared to White males using lighter color shades of the same product.

57.     Defendants represented that their Jet Black color shade was safe and cosmetically effective.

58.     Defendants' warning label for the Jet Black color shade inadequately addressed the potentially severe health risks associated with higher levels of PPD.

59.     Defendants omitted, concealed, and inadequately provided critical safety information regarding the Jet Black color shade in order to induce its purchase and use by African American males.

60.     Defendants intentionally engaged in and continue to engage in conduct likely to mislead African American consumers. This conduct is discriminatory, fraudulent, unfair and unlawful and significantly reduces and/or prevents African American consumers from coming to a meeting of the minds in their agreement to purchase Just For Men® products.

**Defendants' Target Marketing**

61.     Defendants intentionally target marketed their Just For Men® products – in particular the Jet Black color shade – to African American males.

62.     In and of itself, the term "Jet Black" has connotations traditionally associated with the African American population, including Jet Magazine, a weekly African American periodical.

63.     The exterior packaging and on-line image of the Jet Black color shade features a headshot of an African American male.

64.     Upon information and belief, Defendants intentionally placed the Jet Black color shade in "Ethnic Stores" and "Ethnic Sections" that traditionally sell and cater to African American consumers.

65.     Upon information and belief, Defendants collected marketing and consumer data

**CLASS ACTION COMPLAINT**

specific to race, including African American or Black.

66.     Upon information and belief, Defendants intentionally selected product spokespersons and advertising models because they appealed to African American males.

67.     Defendants embarked upon a systemic media advertising campaign – noted as "cheesy, hokey, goofy, silly and evidently effective" – that showcased unique television ads and aired during worldwide sporting events, such as the Super Bowl.  **Exhibit B** – *The New York Times*: "Just For Men Just Right for Former Stars" (Jan. 6, 2008).

68.     Defendants' media advertising campaign targeted African American males by using spokesmen who were prominent African American male sports legends, including Walt "Clyde" Frazier and Emmitt Smith.

69.      Mr. Smith's extreme fame as the Just For Men® pitchman, who "reclaimed his edge" by using the dye product to eliminate grey in his black beard, arguably surpassed his notoriety as an NFL Hall of Fame inductee.  **Exhibit C** – *SB*Nation* "Emmitt Smith's Football Legacy: 18 Talking Points on His 'Just For Men' Commercial" (Aug. 7, 2010).

70.     In 2015, Defendants intensified their media efforts to attract African American males to their facial hair dye products by regurgitating Mr. Frazier as the pitchman for Just For Men® Mustache & Beard.  **Exhibit D** – *Elite Sports NY*, "Keith Hernandez, Walt Frazier Announce Latest Venture" (Aug. 3, 2015).

71.     Mr. Frazier co-announced and appeared in an advertising campaign supporting Defendants' "Best Beard Ever" contest, which encouraged consumers to upload their best beard and mustache photos under the social media hashtag #Beardspotting.  **Exhibit E** – *Business Wire*, "Just For Men® Launches #Beardspotting Contest, a Nationwide Search for the "Best Beard Ever" (Sept. 8, 2015).

72.     Defendants' target marketing to African American males continued in the face of media and Consumer Affairs reports that their products caused sensitization and potentially severe injuries to users.  **Exhibit F** - *News Tribune*, "'Just For Men' Hair Dye Users Report Allergic Reactions" (Oc. 23, 2012).

73.     Defendants' #Beardspotting advertising campaign coincided with the popularity

**CLASS ACTION COMPLAINT**

1  rise of facial hair, including full beards and goatees, in the African American community. **Exhibit**
2  **G** – *Chicago Now*, "The Black Man and His Beard" (Oct. 30, 2015).

3      74.    Despite knowing African American males were five times more likely than White
4  males to experience an adverse reaction to PPD and that the Jet Black color shade contained
5  seventeen times greater PPD than lighter shades of the same product, Defendants continued to
6  aggressively target market African American males.

7      75.    Defendants intentionally engaged in and continue to engage in target marketing
8  likely to induce and mislead African American consumers, including Plaintiff. This conduct is
9  discriminatory, fraudulent, unfair and unlawful.

10                          **Plaintiff's Use Of Just For Men®**

11      76.    Plaintiff, Mr. Stringer, is and was at all times alleged herein a citizen of the State of
12  California and currently resides in Oakland, California.

13      77.    Plaintiff is an African American male.

14      78.    Plaintiff became knowledgeable of Just for Men® products through Defendants'
15  marketing campaigns, including but not limited to television advertisements and social media.

16      79.    Plaintiff was unaware of the high amounts of PPD contained in the Jet Black color
17  shade or the heightened potential that he could experience a severe physical reaction from using
18  the product.

19      80.    Plaintiff purchased and used as directed the Just For Men® Mustache and Beard
20  box kit in the Jet Black color shade on or about September 28, 2016.

21      81.    Prior to applying the Jet Black color shade, Plaintiff performed a skin patch test with
22  the product. The results of the skin patch test were unremarkable and lacked any sign of
23  sensitization.

24      82.    Subsequent to using the Jet Black color shade, Plaintiff suffered a severe physical
25  reaction to the product including but not limited to facial soreness, rash, itching, swelling and
26  burning sensations as well as shortness of breath.

27      83.    Plaintiff's severe physical reaction to the Jet Black color shade required emergency
28  medical treatment and prescription medication on or about October 1, 2016.

**CLASS ACTION COMPLAINT**

84.   Prior to September 28, 2016, Plaintiff had used the Jet Black color shade on many occasions without experiencing a severe physical reaction.

85.   As alleged herein and as a direct and proximate result of Defendants' discriminatory and wrongful conduct:

      a.   Plaintiff has suffered severe physical injuries;

      b.   Plaintiff has endured substantial pain, suffering and embarrassment;

      c.   Plaintiff has individually suffered, and will continue to suffer economic loss, and has otherwise been physically, emotionally and economically injured; and

      d.   Plaintiff's injuries and damages are permanent and will continue into the future.

## CLASS ALLEGATIONS

86.   Plaintiff brings this action on behalf of himself and as a representative of all others who are similarly situated.  Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of a Nationwide Class and a California Class.

87.   The Nationwide Class is initially defined as follows:

All African American males residing in the United States who have purchased, used and incurred injury as a result of using the Just For Men® Jet Black color shade within the applicable statute of limitations, subject to appropriate tolling and estoppel (the "Nationwide Class").

88.   The California Class is initially defined as follows:

All African American males residing in California who have purchased, used and incurred injury as a result of using the Jet Black color shade within the applicable statute of limitations, subject to appropriate tolling and estoppel (the "California Class").

89.   Plaintiff is a member of both Classes.

**CLASS ACTION COMPLAINT**

90.     Plaintiff reserves the right to amend or modify the definitions of the Classes with greater specificity or division into subclasses after having had an opportunity to conduct discovery.

91.     Numerosity (F.R.C.P. 23(a)(1)): Members of the Classes are so numerous that their individual joinder is impracticable.  Plaintiff is informed and believes that there are thousands of African American males who have purchased and sustained physical injury and damages as a result of using the Jet Black color shade.

92.     Commonality (F.R.C.P. 23(a)(2)) and Predominance (F.R.C.P. 23(b)(3)): Common questions of law and fact exist as to all members of the Classes and predominate over any questions which affect the individual members, in that Defendants have engaged in a common course of conduct in dealings with the Classes and acted in a manner generally applicable to the entirety of the Classes. The same legal theories and substantive law will apply to the claims of each member. These common questions of law and fact include but are not limited to the following:

     a.    Whether Defendants target marketed their product to African American males;

     b.    Whether Defendants knew or should have known that human exposure to PPD can cause severe physical injury;

     c.    Whether Defendants knew or should have known that PPD sensitization rates are significantly higher for African American males than White males:

     d.    Whether Defendants knowingly designed, produced, marketed and sold a product that was disproportionately unsafe and hazardous for African American males compared to White males:

     e.    Whether Defendants failed to adequately warn or disclose that African American males using the Jet Black color shade were exposed to significantly greater amounts of PPD and increased risk of suffering physical injury compared to White males using the product;

— 13 —

**CLASS ACTION COMPLAINT**

f.     Whether Defendants' conduct interfered with Plaintiff's contractual rights and enjoyment of the contractual relationship as applied to his purchase transaction of the Jet Black color shade;

g.     Whether Defendants' conduct constitutes a violation of Plaintiff's civil rights under 42 U. S. C. 1981;

h.     Whether Defendants' conduct constitutes a violation of the California Legal Remedies Act, Cal. Civ. Code §§ 1770(a)(5) and (a)(7);

i.     Whether Defendants' conduct constitutes a violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.;

j.     Whether Plaintiff incurred physical injury and other damages because of Defendants' conduct;

k.     Whether the Classes are entitled to declaratory and injunctive relief, and if so, the nature of such equitable relief; and

l.     Whether Defendants are liable for punitive or exemplary damages, and if so, what amount is appropriate to punish them for their wanton and reckless conduct and deter such future conduct.

93.     Typicality (F.R.C.P. 23(a)(3)): Plaintiff's claims are typical of the claims of all members within the Classes. Plaintiff has been injured and discriminated against by the same targeted conduct that Plaintiff alleges herein to have harmed the Classes as a whole. Plaintiff and the members of the Classes are all African American males who purchased, used and were injured by the Jet Black color shade. Defendants' wrongful and discriminatory conduct as alleged herein affected Plaintiff and the Classes in substantially the same manner.

94.     Adequacy of Representation (F.R.C.P. 23(a)(4)): Plaintiff is an adequate representative of the Classes because he is a typical member and his interests do not conflict with the members of the Classes. Plaintiff has retained counsel competent and highly experienced in complex and class action litigation and consumer and civil rights actions. Plaintiff intends to prosecute this action vigorously, to conclusion, for the benefit of the Classes. Plaintiff and counsel will fairly and adequately protect and advocate the interest of the members of the Classes.

— 14 —

**CLASS ACTION COMPLAINT**

95.    Superiority (F.R.C.P. 23(b)(1)-(3)): A class action is superior to other available means for the fair and efficient adjudication of this controversy and will result in a substantial benefit to the Classes, the public and the court system.  This action presents common issues of law and fact that predominate over any individual class member's questions.  Individual litigation of each member's claim is impractical and would increase the delay and expense to all parties and the court system in resolving the legal and factual issues in this case, and would further present the potential for inconsistent or contradictory rulings and judgments concerning the complex subject of this action.  Moreover, Defendants' conduct – specifically the unlawful manufacturing, sales and marketing of the Jet Black color shade to African American males – is ongoing.  Accordingly, individual actions would not settle the issue of whether Defendants' conduct in the future is unlawful.  Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

### FIRST CAUSE OF ACTION
**Violation of 42 U.S.C. § 1981**
**(By Plaintiff and the Nationwide Class Against Defendants)**

96.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein.

97.    Plaintiff brings this claim individually and on behalf of the members of the Nationwide Class against Defendants.

98.    The Civil Rights Act of 1866, as amended 42 U.S.C. § 1981, guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same rights…to make and enforce contracts…as is enjoyed by white citizens, includ(ing) the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."

99.    Section 1981 prohibits racial discrimination in the sale and distribution of products to the public.

100.    Plaintiff and the Class are African Americans, and their rights to make contracts and enjoy the benefits of contractual relationships without impairments are protected by 42 U.S.C. §

1981.

101.    Defendants knowingly designed, produced, marketed and sold Just For Men® products that were disproportionately unsafe and hazardous for African American males compared to White males.

102.    Defendants discriminated against Plaintiff and the Class by knowingly failing to adequately warn or disclose that African American males using the Jet Black color shade were exposed to significantly greater amounts of PPD and increased risk of suffering a potentially severe physical injury compared to White males using the same product and/or lighter color shades of the same product.

103.    Defendants discriminated against Plaintiff and the Class by aggressively and unfairly targeting African American males in their marketing and advertising campaigns despite knowing that their products exposed African American males to greater amounts of PPD and increased risk of suffering a potentially severe physical injury compared to White males using the same product and/or lighter color shades of the same product.

104.    Defendants' target marketing and deliberate failure to disclose a material trait of their products (namely, dangerous heightened PPD levels) and failure to warn of the increased likelihood for severe physical injury to African Americans compared to White consumers amounted to inducement, concealment and misrepresentation in contracting. Plaintiff and the Class were unable to make an informed decision in the purchase of the Just For Men® product and their contractual rights were impaired.

105.    Defendants interfered with the ability of Plaintiff and the Class to secure the equal performance and enjoyment of a contract as was offered to White consumers by denying them and equal ability to reach a meeting of the minds in contracting for the purchase of Just for Men® products.

106.    Defendants interfered with ability of Plaintiff and the Class to enjoy the alleged benefits of purchasing the Just For Men® product, in that they relied on Defendants' false claims that the Jet Black color shade was safe and cosmetically effective and that reliance resulted in severe physical injury.

**CLASS ACTION COMPLAINT**

107.   Defendants' discriminatory and wrongful actions constitute a lack of good faith and fair dealing in contracting with Plaintiff and the Class.

108.   As a result of Defendants' actions, Plaintiff and the Class have suffered physical injury, emotional distress, humiliation, degradation, and other damages both pecuniary and non-pecuniary in nature.

109.   Plaintiff and the Class have suffered harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

110.   Defendants' conduct complained of herein was intentional, willful, malicious, oppressive, wanton and with reckless indifference of basic civil rights and, accordingly, Plaintiff and the Class are entitled to punitive damages under 42 U.S.C. § 1981a(b)(1) in an amount sufficient to punish Defendant and deter future unlawful conduct.

**SECOND CAUSE OF ACTION**
**Violation of California Legal Remedies Act**
**(Cal. Civ. Code, §§ 1750, *et seq.*)**
**(By Plaintiff and the California Class Against Defendants)**

111.   Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

112.   Plaintiff brings this claim individually and on behalf of the members of the California Class against Defendants.

113.   The California Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*, provides consumers with a private right of action for "unfair methods of competition and unfair or deceptive acts or practices" in connection with the sale of goods.

114.   The Just for Men® Jet Black color shade products are "goods" within the meaning of Cal. Civ. Code § 1761(a), Plaintiff and each member of the California Class are consumers as defined by California Civil Code § 1761(d), and the purchase of such products by Plaintiff and each member of the California Class constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

115.   The CLRA's list of proscribed practices relevant to this action are "[r]epresenting

— 17 —

that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . ." and "[r]epresenting that goods or services are of a particular standard, quality, or grade." Cal. Civ. Code §§ 1770(a)(5), 1770(a)(7).

116.   The aforementioned provisions of the CLRA apply to affirmative misrepresentations as well as omissions and/or concealment.

117.   Defendants market and otherwise represent that their Just For Men® product is safe and cosmetically effective for use by African American males, as evidenced by assertions such as Just For Men® products are backed by "three decades of research and have delivered great results over 50 million times."  Defendants specifically purport that the Mustache & Beard box kit will give consumers their "best beard ever in 5 minutes" and result in "beard nirvana."

118.   Defendants had exclusive knowledge of and concealed and/or failed to disclose that African American males using the Jet Black color shade were exposed to significantly greater amounts of PPD and increased risk of suffering a potentially severe physical injury compared to consumers using lighter color shades of the same product.

119.   The heighted PPD levels in the Jet Black color shade as well as the significant risk of potentially severe physical injury were material facts to the consumer transactions between Defendants and Plaintiff as well as Defendants and the California Class.

120.   Defendants knew and intended that their concealment or failure to disclose the heightened PPD levels in the Jet Black color shade and the significant risk of potentially severe physical injury would create a false impression in consumers regarding product safety and cosmetic effectiveness.

121.   Plaintiff and members of the California Class were induced by and relied on Defendants' on-going deceit regarding the safety and cosmetic effectiveness of the Jet Black color shade and as a result suffered harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

122.   On May 30, 2017, Plaintiff sent Defendants written notice of the violations contained herein and demanded that they rectify the wrongful acts pursuant to Cal. Civ. Code §1782(a).  The notice was sent via certified mail, return receipt requested.

**CLASS ACTION COMPLAINT**

123.    Plaintiff presently seeks injunctive relief only for violation of the CLRA, but if Defendants fail to rectify or agree to rectify their actions then Plaintiff will amend this Complaint to include allegations for the recovery of actual, punitive and statutory damages pursuant to Cal. Civ. Code §1780(a)(3). Plaintiff also will seek a Court order enjoining the above-described wrongful acts and practices of Defendants and for restitution, disgorgement, statutory damages, and any other relief that the Court deems proper.

**THIRD CAUSE OF ACTION**
**Violation of California's Unfair Competition Law**
**(Cal. Bus. & Prof. Code, §§ 17200, *et seq.*)**
**(By Plaintiff and the California Class Against Defendants)**

124.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

125.    Plaintiff brings this claim individually and on behalf of the members of the California Class against Defendants.

126.    Plaintiffs has standing to pursue this cause of action as Plaintiff has suffered injury in fact and have lost money or property as a result of Defendants' actions as delineated herein.

127.    The California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (the "UCL"), broadly prohibits unfair competition in the form of any "unlawful, unfair, or fraudulent business act or practice."

128.    Defendants' business practices, as alleged herein, violate the "unlawful" prong of California Business & Professions Code sections 17200, *et seq.*, because: (i) race discrimination in contracting, as alleged herein against Defendants, is prohibited under 42 U.S.C. §1981; and (ii) deceptive conduct by concealment and/or omission, as alleged herein against Defendants, violates the CLRA, Cal. Civ. Code § 1750, *et seq.*

129.    Defendants' business practices, as alleged herein, violate the "fraudulent" prong of California Business & Professions Code section 17200, *et seq.* because they are likely to deceive a reasonable consumer.

130.    Defendants' business practices, as alleged herein, violate the "unfair" prong of

California Business & Professions Code sections 17200, *et seq.* because: (i) the utility of Defendants' failure to adequately warn or disclose that African American males using the Jet Black color shade is significantly outweighed by the gravity of the harm the imposed on Plaintiff and the California Class; (ii) the injury suffered by Plaintiffs and the members of the California Class as a result of Defendants' failure to adequately warn or disclose that African American males using the Jet Black color shade is not one that Plaintiff and the members of the California Class could have reasonably avoided; and (iii) Defendants' failure to adequately warn or disclose that African American males using the Jet Black color shade not only threatens the safety of consumers but also is racially oppressive and morally reprehensible.

131.    As a direct and proximate result of Defendants' unlawful, unfair, and fraudulent business practices regarding the Jet Black color shade, Plaintiff and the California Class suffered injury and Defendants have unlawfully, unfairly and/or fraudulently obtained money from Plaintiff and the members of the California Class.

132.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and the California Class seek an order requiring Defendants to make full restitution of all monies they wrongfully obtained from Plaintiff and members of the California Class.

133.    Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff seeks an order of the Court enjoining Defendants from manufacturing, selling and marketing the Just For Men® Jet Black color shade (specifically the Original Formula and Mustache and Beard box kits) until proper disclosures and warnings are made regarding the PPD amounts and the risk of potentially severe physical injury for African American consumers or, alternatively, the PPD ingredient is appropriately reduced or removed.  Otherwise, Plaintiff, the members of the California Class and the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## **PRESERVATION CLAIMS**

134.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs, as though fully set forth herein.

1   135.   To the extent that Defendants may allege that one or more of Plaintiff's claims are
2   barred by the applicable statute of limitations, Plaintiff asserts that the statute of limitations is and
3   has been tolled by Plaintiff's discovery that his injuries were caused by Defendants' dangerous
4   product and failure to adequately warn of the product's risks, all as more fully set forth in this
5   Complaint.

6   136.   Plaintiff further asserts that Defendants' intentional acts of concealment alleged
7   herein have tolled the applicable statutes of limitations, in that Plaintiff could not have reasonably
8   discovered the dangerous levels of PPD contained in the Jet Black color shade or the likelihood
9   of severe physical injury.

10   137.   In the alternative, Defendants are estopped from relying on any statute of limitations
11   because of their concealment of the dangerous levels of PPD contained in the Jet Black color
12   shade or the likelihood of severe physical injury.  Defendants were under a duty to disclose this
13   information because it is non-public information over which Defendants had exclusive control,
14   because Defendants knew this information was not available to Plaintiff and because this
15   information was crucial to Plaintiff in making his purchasing decision.

16

17                                    **<u>PRAYER FOR RELIEF</u>**

18   WHEREFORE, Plaintiff, John Stringer, on behalf of himself and the Classes, prays for
19   the following relief:

20       A.   Certification of the proposed Nationwide Class and California Class, including
21            appointment of Plaintiff as Class representative and their counsel as Class Counsel
22       D.   The court issue a preliminary and permanent injunction requiring Defendants to
23            immediately cease and desist from manufacturing, distributing, selling and
24            promoting the Just For Men® Jet Black color shade products (specifically the
25            Original Formula and Mustache & Beard box kits) and from the target marketing
26            of those products to African American males until proper disclosures and
27            warnings are made regarding the PPD amounts and the risk of potentially severe

28

**CLASS ACTION COMPLAINT**

1    physical injury for African American consumers or, alternatively, the PPD

2    ingredient is appropriately reduced or removed;

3    E.   Trial by jury;

4    F.   Judgment in favor of Plaintiff and the Classes and against all Defendants, for all

5    damages in such amounts as may be proven at trial;

6    G.   Compensation for non-economic losses, including, but not limited to

7    disfigurement, pain and suffering, mental anguish and emotional distress, in such

8    amounts as may be proven at trial;

9    H.   Punitive and/or exemplary damages in such amounts as may be proven at trial;

10   I.   Restitution and disgorgement of all revenue that Defendants have obtained

11   through the manufacture, marketing, and sale of the Just For Men® Jet Black color

12   shade products;

13   J.   Attorney's fees and costs;

14   K.   Pre- and post-judgment interest; and

15   L.   Any and all further relief, both legal and equitable, that the Court may deem just

16   and proper.

17

18   Dated: June 2, 2017          ARIAS, SANGUINETTI, STAHLE & TORRIJOS, LLP

19                                By: _Elise R Sanguinetti_

20                                Elise R. Sanguinetti
                                  Alfredo Torrijos
21

22                                URBAN & TAYLOR S.C.
                                  Jay A. Urban (*Pro Hac Vice* to be submitted)
23

24                                *Counsel for Plaintiff John Stringer*

25

26

27

28

— 22 —

**CLASS ACTION COMPLAINT**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**JURY TRIAL DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff, individually and on behalf of all others similarly situated, hereby demands a trial by jury of any and all issues in this action so triable of right.

Dated: June 2, 2017

ARIAS, SANGUINETTI, STAHLE & TORRIJOS, LLP

By: _Elise R. Sanguinetti_

Elise R. Sanguinetti
Alfredo Torrijos

URBAN & TAYLOR S.C.
Jay A. Urban (*Pro Hac Vice* to be submitted)

*Counsel for Plaintiff John Stringer*

— 23 —

**CLASS ACTION COMPLAINT**

# Venue Affidavit of John Stringer

## AFFIDAVIT OF JOHN STRINGER

I, JOHN STRINGER, declare as follows:

1.  I am the Plaintiff in the above lawsuit against Defendants Combe Inc., Combe Products, Inc., Combe Laboratories, Inc. and Combe International, Ltd ("Defendants").

2.  The Complaint specifically pleads violation of the Consumer Legal Remedies Act ("CLRA"), Cal. Civ. Code §1750, *et seq.*

3.  I presently reside in Alameda County, in where the underlying transaction at issue occurred and Defendants conduct business. This action is properly placed in Alameda County of the Northern District California, Oakland Division.

4.  I make this affidavit as required by Cal. Civ. Code § 1780(d).

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct to the best of my knowledge.

Executed this **31** day of May, 2017.

John Stringer

30

**EXHIBIT A**

**STUDY**

# Comparison of Patch Test Results With a Standard Series Among White and Black Racial Groups

*Heinrich Dickel, James S. Taylor, Phyllis Evey, and Hans F. Merk*

***Background:*** Environmental, cultural, occupational, genetic, individual, and racial differences are important factors in the study of contact dermatitis. Some epidemiologic studies have compared overall sensitization rates among different racial groups, but similar data are lacking on individual allergens.

***Objective:*** Determine differences in sensitization rates between 2 racial groups in North America undergoing patch testing over a period of 4 years at the Cleveland Clinic Foundation (CCF), Ohio.

***Methods:*** Retrospective computer review of the standard screening tray results of 991 patients with an average age of 45.9 years consisting of 877 (88.5%) whites and 114 (11.5%) blacks.

***Results:*** Nickel sulfate and thiomersal (both 8.0%) and nickel sulfate and *p*-phenylenediamine (both 10.6%) were the 2 most common sensitizers among whites and blacks respectively. There was a statistically significant difference (*P* = .00599) in the sensitization rate for *p*-phenylenediamine in blacks (10.6%) compared with whites (4.5%). There were also statistically significant differences in sensitization rates for *p*-phenylenediamine (21.2%; *P* = .00005) and imidazolidinyl urea in petrolatum (pet.) (9.1%; *P* = .04103) in black men compared with white men (*p*-phenylenediamine [4.2%] and imidazolidinyl urea [2.6% pet.]).

***Conclusion:*** The differences in sensitization rates, especially for *p*-phenylenediamine, may reflect variations in allergen exposure among racial groups or interindividual variations in the N-acetylation (N-acetyltransferase 1 [NAT1] and 2 [NAT2]) capacities of human skin for *p*-phenylenediamine.
*Copyright © 2001 by W.B. Saunders Company*

CONTACT DERMATITIS might be influenced by environmental, cultural, occupational, individual, genetic and racial or ethnic factors.[1-4] In 1941, Rostenberg et al[5] presented experimental evidence that blacks are less susceptible to eczematous contact sensitization than are whites. A number of other studies followed,[6-15] investigating anatomic, color, chemical resistance, transcutaneous penetration, percutaneous absorption, microcirculation, irritation,

and sensitization differences that may cause a racial variance in skin sensitivity. As a result, most investigators suggest that dark-colored skin is less irritable and less receptive to allergic contact sensitization than light-colored skin.[2,16-19] Another explanation is that dark-colored skin is less capable of expressing the inflammatory change by which the allergic state is recognized.[6] Experimental data on some issues are contradictory, and the clinical relevance of these findings is still uncertain.[19]

From a practical, clinical viewpoint, dark-skinned people are more prone to develop hyperpigmentation, infiltration, and lichenification than those with light-colored skin.[20-22] It is generally believed that manifestations of contact allergy are more difficult to observe in blacks as a result of less erythema in dark-colored skin.[13,20]

A few epidemiologic studies have briefly addressed overall sensitization rates in various racial groups.[23-26] Very little comparative data are available on sensitization rates to particular substances.[23,27] According to Fisher,[20,21] the inci-

*From the Departments of Dermatology of Rheinisch-Westfälische Technische Hochschule Aachen, Aachen, Germany, and The Cleveland Clinic Foundation, Cleveland, OH.*

*Supported by a BAER (Bicontinental Association for Education and Research in Dermatology, dedicated to Rudolf L. Baer, MD) fellowship (H.D.) to the Department of Dermatology, University Hospitals of Cleveland, Case Western Reserve University, Cleveland, Ohio.*

*No reprints available. Address correspondence to James S. Taylor, MD, Department of Dermatology, Section of Industrial Dermatology, The Cleveland Clinic Foundation, A 61, 9500 Euclid Ave, Cleveland, OH 44195-5032.*

*Copyright © 2001 by W.B. Saunders Company*
*1046-199X/01/1202-0003$35.00/0*
*doi:10.1053/ajcd.2001.20110*



PLAINTIFF'S EXHIBIT A

dence of contact dermatitis is about the same in whites and blacks. Racial differences may be more likely a result of socioeconomic as well as environmental factors.[20,25]

The purpose of this retrospective study is to investigate differences in patch test sensitization rates to individual chemicals between 2 racial groups in North America.

## Materials and Methods

Results of all patients patch tested with the standard screening tray at the Cleveland Clinic Foundation (CCF) between January 1, 1988, and December 31, 1991, were analyzed according to racial groups; overall results for the period have been previously reported.[28] Some substances were not tested during the entire 4-year period: (1) thiourea mix 1% in petrolatum (pet.) 1989 to 1991, (2) betamethasone dipropionate 0.5% pet. 1991, (3) triamcinolone acetonide 1% pet. 1991, (4) d-alpha-tocopherol acetate 4% pet. 1988 to 1989, (5) benzyl alcohol 5% pet. 1988 to 1990, and (6) eugenol 4% pet. 1988 to 1990. Data from the CCF for January 1, 1988, to July 30, 1989, were included in the overall North American Contact Dermatitis Group (NACDG) data for 1985 through 1989, which have been published.[29-34]

Patients were tested on their backs according to standard methodology[35] using Finn chambers (Epitest Ltd, Oy, Finland) on Scanpor tape (Norgesplaster, A/S, Norway). Test sites were on normal skin, free of dermatitis. Allergens were obtained from HERMAL, Kurt Herrmann, Reinbeck/Hamburg, Germany, and from Chemotechnique Diagnostics, Malmö, Sweden.

Patch tests were removed at home, usually by a relative, after 48 hours, and the first reading was routinely performed in the office at day 3 (72 hours); later readings were done in the majority of patients between days 4 (96 hours) and 8 (192 hours). Positive results in this report are the readings at day 3. The patch test results were graded using the classification system of the American Academy of Dermatology.[35] All +, ++, and +++ positive results were included in analysis. Doubtful [?/(+)] and irritant (IR) results were counted as no response.

With reference to Witzig,[36] we used the term race as a strictly biological concept to describe groups of patients by perceived skin color. The word white includes such racial terms as light-colored, caucasian, anglo, and European, and black includes dark-colored, negro, and African (-American), respectively. In contrast, ethnicity is a concept that incorporates social, religious, linguistic, dietary, and other variables to identify individual people and populations.[36]

The data were recorded on a Macintosh-based personal computer (Apple Quadra 900) in Cologne, Germany. The database used was 4th Dimension (ACI), and the statistics were run on SPSS (SPSS Inc). Data were initially entered in a database running on a VAX computer system at the CCF and were downloaded on disks using the ASCII data file format.

The sensitizing substance index was calculated by the formula: {relative frequency (%) = positive cases (n) ÷ entire cases (N) × 100}. Differences between relative frequencies were tested for significance by performing the $\chi^2$ statistic. The $\chi^2$ test was not computed if the frequencies were not sufficient enough to attain statistical significance. This was the case if any cell had an expected frequency less than 1 or if more than 1 cell had expected frequencies less than 5. Further statistical analysis of the data was obtained using the independent samples *t*-test to determine differences among means. Alpha was set at 0.05.

## Results

In the period from 1988 to 1991, 1,005 patients were tested with the standard screening tray. The majority of the clinical population studied were whites (87.3%, 877 of 1,005), followed by blacks (11.3%, 114 of 1,005), and other races (1.4%, 14 of 1,005). This article concentrates on patch test results of whites and blacks. Because of small sample size with possible bias,[26] the other racial groups were not evaluated.

The MOAHL Index[37] for this subpopulation is listed by total/whites/blacks: The total number of patients seen at day 3 = 991/877/114; positive reactors = 43.5%/43.6%/43.0%; men = 42.4%/44.0%/29.8%; occupational dermatitis = 12.3%/12.7%/9.6%; atopy = 31.8%/31.0%/37.7%; hand eczema = 41.3%/43.9%/21.1%; and leg ulcers/stasis eczema = 9.4%/9.9%/5.3%.

The average age for this group was 45.9 years (±16.1). There were 811 whites (88.5%, 877 of 991) with an average age of 45.7 years (±16.1)

*Patch Test Results Among Racial Groups*     **79**

**Table 1.** Relative Frequency of Allergens by Racial Group and Gender

| Standard Tray 1988-1991 Test Substances | | Whites % | Blacks % | P | Women Whites % | Women Blacks % | P | Men Whites % | Men Blacks % | P |
|---|---|---|---|---|---|---|---|---|---|---|
| Balsam of Peru | 25% pet. | 5.3 | 2.7 | NS | 3.2 | 0.0 | NS | 7.9 | 9.1 | NS |
| Benzocaine | 5% pet. | 2.7 | 4.5 | NS | 1.9 | 3.8 | NS | 3.7 | 6.3 | NS |
| Benzoyl Peroxide | 1% pet. | 3.3 | 0.0 | NS | 3.4 | 0.0 | NS | 3.2 | 0.0 | NC |
| Benzyl Alcohol | 5% pet. | 0.3 | 0.0 | NC | 0.3 | 0.0 | NC | 0.4 | 0.0 | NC |
| Betamethasone Dipropionate | 0.5% pet. | 1.0 | 0.0 | NC | 0.0 | 0.0 | NC | 2.1 | 0.0 | NC |
| p-*tert*-Butylphenol Formaldehyde Resin | 1% pet. | 0.8 | 0.0 | NC | 0.9 | 0.0 | NC | 0.8 | 0.0 | NC |
| Carba Mix | 3% pet. | 2.2 | 0.0 | NS | 2.1 | 0.0 | NS | 2.4 | 0.0 | NC |
| Cinnamic Alcohol | 5% pet. | 2.3 | 1.8 | NS | 2.3 | 2.5 | NS | 2.4 | 0.0 | NC |
| Cinnamic Aldehyde | 1% pet. | 1.3 | 1.8 | NS | 1.3 | 2.5 | NS | 1.3 | 0.0 | NC |
| Colophony | 20% pet. | 1.4 | 0.9 | NS | 1.5 | 1.3 | NS | 1.3 | 0.0 | NC |
| Diaminodiphenyl Methane | 0.5% pet. | 2.8 | 5.3 | NS | 2.1 | 3.8 | NS | 3.7 | 8.8 | NS |
| Diazolidinyl Urea | 1% aq. | 2.6 | 3.6 | NS | 1.7 | 1.3 | NS | 3.7 | 9.4 | NS |
| Diazolidinyl Urea | 1% pet. | 1.6 | 3.5 | NS | 1.9 | 1.3 | NS | 1.3 | 9.1 | NC |
| Epoxy Resin | 1% pet. | 1.3 | 1.8 | NS | 0.6 | 0.0 | NC | 2.1 | 5.9 | NC |
| Ethylenediamine dihydrochloride | 1% pet. | 1.8 | 3.5 | NS | 1.7 | 3.8 | NS | 1.8 | 3.0 | NC |
| Eugenol | 4% pet. | 1.9 | 1.4 | NS | 2.2 | 0.0 | NS | 1.4 | 5.6 | NC |
| Formaldehyde | 1% aq. | 5.4 | 4.4 | NS | 5.5 | 2.5 | NS | 5.2 | 8.8 | NS |
| Imidazolidinyl Urea | 2% pet. | 1.9 | 3.5 | NS | 1.3 | 1.3 | NS | 2.6 | 9.1 | *P**  |
| Imidazolidinyl Urea | 2% aq. | 1.4 | 2.7 | NS | 0.9 | 1.3 | NC | 2.1 | 6.1 | NC |
| Mercapto Mix | 1% pet. | 1.5 | 0.9 | NS | 0.6 | 1.3 | NC | 2.6 | 0.0 | NC |
| Mercaptobenzothiazole | 1% pet. | 1.4 | 0.9 | NS | 0.6 | 1.3 | NC | 2.4 | 0.0 | NC |
| Neomycin Sulfate | 20% pet. | 3.3 | 4.4 | NS | 3.4 | 3.8 | NS | 3.2 | 6.1 | NS |
| Nickel Sulfate | 2.5% pet. | 8.0 | 10.6 | NS | 11.2 | 13.8 | NS | 4.0 | 3.0 | NS |
| p-Phenylenediamine | 1% pet. | 4.5 | 10.6 | P† | 4.7 | 6.3 | NS | 4.2 | 21.2 | P‡ |
| Potassium Dichromate | 0.25% pet. | 2.0 | 1.8 | NS | 1.1 | 0.0 | NC | 3.2 | 6.3 | NS |
| PPD Mix | 0.6% pet. | 2.1 | 0.9 | NS | 2.1 | 0.0 | NS | 2.1 | 3.0 | NC |
| Quaternium 15 | 2% pet. | 6.8 | 6.2 | NS | 6.6 | 6.3 | NS | 7.1 | 6.1 | NS |
| Thiomersal | 0.1% pet. | 8.0 | 6.5 | NS | 8.3 | 7.7 | NS | 7.7 | 3.3 | NS |
| Thiourea Mix | 1% pet. | 0.4 | 0.0 | NC | 0.3 | 0.0 | NC | 0.4 | 0.0 | NC |
| Thiuram Mix | 1% pet. | 4.3 | 2.6 | NS | 4.1 | 3.8 | NS | 4.5 | 0.0 | NS |
| d-alpha-Tocopherol Acetate | 4% pet. | 0.0 | 0.0 | NC | 0.0 | 0.0 | NC | 0.0 | 0.0 | NC |
| Triamcinolone Acetonide | 1% pet. | 1.0 | 0.0 | NC | 0.0 | 0.0 | NC | 2.1 | 0.0 | NC |
| Wool Alcohols | 30% pet. | 2.1 | 0.9 | NS | 1.7 | 0.0 | NS | 2.6 | 2.9 | NC |

Abbreviations: NC, $\chi^2$-test not computed; NS, difference not statistically significant, pet., in petrolatum; aq., aqueous.
* $P = .05 = .01$
† $P = .01 = .001$
‡ $P = .001$

versus 114 blacks (11.5%, 114 of 991) with an average age of 48.1 years (±15.9); not significant. There were 491 white women (56.0%, 491 of 877) with an average age of 45.0 years (±16.4) versus 80 black women (70.2%, 80 of 114) with an average age of 46.3 years (±16.0); not significant. There were 386 white men (44.0%, 386 of 877) with an average age of 46.5 years (±15.8) versus 34 black men (29.8%, 34 of 114) with an average age of 52.3 years (±15.2); difference among means of age was statistically significant ($P = .04$).

There were 1 or more positive patch tests in 382 white subjects (43.6%, 382 of 877) versus 49 black subjects (43.0%, 49 of 114); in 208 white women (42.4%, 208 of 491) versus 31 black women (38.8%, 31 of 80); and in 174 white men (45.1%, 174 of 386) versus 18 black men (52.9%, 18 of 34). These differences were not statistically significant.

Table 1 shows the relative frequencies of the standard battery of allergens by racial group and gender. There was a statistically significant higher sensitization rate for p-phenylenediamine (PPDA) 1% pet. in blacks compared with whites ($P = .00599$). There were also statistically signif-

icant higher sensitization rates noted in black men compared with white men for both PPDA 1% pet. ($P = .00005$) and imidazolidinyl urea 2% pet. ($P = .04103$).

## Discussion

Differences between dark- and light-colored human skin have been considered in many scattered studies using epidemiologic or experimental approaches.[5-15,23,24] Interpretation of results has often been problematic, and agreement between investigations is rare.

In our study the distribution ratio of patients by racial groups is similar to that reported in previous studies from Leyden and Kligman[24] and the NACDG.[23,29,32,38] Gender ratio for men as well as mean age of the total subpopulation are comparable with the reports of those groups.[24,29,30,32-34,38]

In our study the overall prevalence of positive patch test reactivity in whites was 43.6%, whereas in blacks it was 43.0%. We found a range from 38.8% for black women to 52.9% for black men. Our data indicate that except for PPDA, there is a similar frequency of positive responses to contact allergens among the 2 racial groups. Other investigators also noted no significant difference between whites and blacks.[23,24] This is supported by a study by Goh[26] in which the prevalence rates of contact allergy were about the same among Chinese, Malays, and Indians.

Publications from the NACDG[23,29,38-41] indicate that nickel sulfate is the most frequently reacting substance. In a recent study, McDonagh et al[42] confirmed that ear piercing is likely to induce nickel sensitivity in women, whereas men are more likely to be sensitized by occupational exposure. Our data show that the frequency of positive patch tests to nickel sulfate was 10.6% in blacks and 8.0% in whites, with women predominating. According to Rudner et al[23] white women are less often sensitized to nickel than black women.

PPDA is mainly used as an ingredient in hair and fur dyes, as well as in leather processing. The most common source of sensitivity is in permanent, oxidation-type hair colors. PPDA is the third most common ingredient after fragrances and preservatives that cause contact dermatitis from cosmetics.[43,44] According to Fisher,[21] hair dyes are found to be the most common cosmetic

sensitizers among black patients. In our study, the frequency of positive PPDA patch tests was 10.6% in blacks and 4.5% in whites, which is significant at the 1% significance level. Its preponderance in black men (21.2%) is highly significant at the 0.1% significance level. Our data are in general agreement with the belief that PPDA is one of the most significant contactants in the black population.[20] Higher concentrations of PPDA are present in hair colors used by black patients (W.E. Dressler, personal communication, October 1999). The higher sensitizing index for PPDA in black men undergoing patch testing may also be a result of its more frequent use in mustache areas and scalp sites.[20] However, earlier reports from the NACDG indicated, in contrast to our findings, a predominance of women reacting to PPDA.[23,30,34]

Recently, the acetylator genotype and phenotype (acetylation polymorphism) in patients with PPDA sensitization has been under investigation.[45,46] In PPDA-sensitive patient groups, Schnuch et al[46] reported a greater proportion of rapid acetylators of N-acetyltransferase 2 (NAT2), whereas Kawakubo et al[45] found no rapid but more slow acetylators. In a new study, Kawakubo et al[47] found that the acetylation of PPDA in human skin and keratinocytes is predominantly attributable to N-acetyltransferase 1 (NAT1) and considered acetylation of PPDA to be a detoxification reaction for allergic contact dermatitis. Although the results are contradictory, these studies support potential involvement of N-acetyltransferase in the development of allergy to PPDA. Racial differences in N-acetylation activities have been documented.[48,49] Whites and Africans have a high proportion of slow acetylators, whereas Asians and American Indians have a high proportion of rapid acetylators; hispanics are intermediate between these 2 groups. Thus, our results are based on different exposure characteristics rather than on the genetic trait.

The frequency of positive patch test results to potassium dichromate was 2.0% in whites and 1.8% in blacks, with a predominance in black men (6.3%). The lower patch test concentration of 0.25% pet. may reflect the lower overall rate of chromate positivity. The cement industry is typically dominated by men, reflected in a higher sensitizing rate for men.[23,34]

Our data are in contrast to those of Rudner et al,[23] illustrating a predominance of white men.

The higher prevalence trends in our study for formaldehyde, diaminodiphenyl methane, diazolidinyl urea, imidazolidinyl urea, and epoxy resin in black men may be more likely secondary to environmental or occupational exposure rather than racial predisposition. Goh et al[25] showed that the occurrence rate of common occupational allergens was well matched with ethnic group distribution in Singapore industry.

In a previous report from the CCF, Parker and Taylor[50] studied contact allergy to quaternium 15 from 1983 to 1987. Moisturizers and noncoloring hair preparations were the most common relevant products, hands were the most commonly affected site, and blacks had a markedly higher sensitivity rate ($P = .015$). The higher frequency in blacks may come from more frequent use of hair care products containing quaternium 15. However, data from the CCF in this study for 1988 to 1991 did not show a significant racial distribution for this allergen.

Our results did not confirm Kligman's[6] finding of a greater susceptibility of white skin to less potent allergens (e.g., neomycin sulfate), which was based on his findings that the average intensity of allergic patch test reactions to the same allergens were greater in white skin. Kligman and Epstein[16] recommended selection of white subjects for detecting less potent sensitizers in the maximization test.

## Conclusion

Knowledge about susceptibility of various racial groups to allergic contact sensitization is still limited, and data interpretation is problematic. Except for PPDA, we found no epidemiologic evidence for a significant difference in prevalence of contact dermatitis between black and white skin. Further experimental and prospective clinical studies are warranted to examine the ongoing controversies on the differences between the skin of the 2 racial groups.

## Acknowledgments

We are especially indebted to Kevin D. Blinkhorn (Information Services, Application Center, Cleveland Clinic Foundation) for his technical contribution.

## References

1. Dahl MV: Chronic, irritant contact dermatitis: Mechanisms, variables, and differentiation from other forms of contact dermatitis. Adv Dermatol 3:261-275, 1988
2. Berardesca E, Maibach HI: Sensitive and ethnic skin: A need for special skin-care agents? Dermatol Clin 9:89-92, 1991
3. Lim JTE, Goh CL, Ng SK, et al: Changing trends in the epidemiology of contact dermatitis in Singapore. Contact Dermatitis 26:321-326, 1992
4. Olumide YM: Contact dermatitis in Nigeria. Contact Dermatitis 12:241-246, 1985
5. Rostenberg A, Kanof NM: Studies in eczematous sensitizations: I. A comparison between the sensitizing capacities of two allergens and between two different strengths of the same allergen and the effect of repeating the sensitizing dose. II. Comparisons between the Negro and white. J Invest Dermatol 4:504-516, 1941
6. Kligman AM: The identification of contact allergens by human assay. II. Factors influencing the induction and measurement of allergic contact sensitivity. J Invest Dermatol 47:375-392, 1966
7. Weigand DA, Haygood C, Gaylor JR: Cell layers and density of negro and caucasian stratum corneum. J Invest Dermatol 62:563-568, 1974
8. Weigand DA, Gaylor JR: Irritant reaction in negro and caucasian skin. South Med J 67:548-551, 1974
9. Wedig JH, Maibach HI: Percutaneous penetration of dipyrithione in man: Effect of skin color (race). J Am Acad Dermatol 5:433-438, 1981
10. Guy RH, Tur E, Bjerke S, et al: Are there age and racial differences to methyl nicotinate-induced vasodilatation in human skin? J Am Acad Dermatol 12:1001-1006, 1985
11. Wilson D, Berardesca E, Maibach HI: In vitro transepidermal water loss: Differences between black and white human skin. Br J Dermatol 119:647-652, 1988
12. Berardesca E, Maibach HI: Sodium-lauryl-sulphate–induced cutaneous irritation: Comparison of white and hispanic subjects. Contact Dermatitis 19:136-140, 1988
13. Berardesca E, Maibach HI: Racial differences in sodium lauryl sulphate induced cutaneous irritation: Black and white. Contact Dermatitis 18:65-70, 1988
14. Berardesca E, Maibach H: Cutaneous reactive hyperaemia: Racial differences induced by corticoid application. Br J Dermatol 120:787-794, 1989
15. Berardesca E, Maibach HI: Racial differences in pharmacodynamic response to nicotinates in vivo in human skin: Black and white. Acta Dermatovener (Stockh) 70:63-66, 1990
16. Kligman AM, Epstein W: Updating the maximization test for identifying contact allergens. Contact Dermatitis 1:231-239, 1975
17. Andersen KE, Maibach HI: Black and white human skin differences. J Am Acad Dermatol 1:276-282, 1979
18. Frosch PJ: Cutaneous irritation, in Rycroft RJG, Menné T, Frosch PJ, et al (eds): Textbook of Contact Dermatitis, ed 1. Berlin, Springer-Verlag, 1992, pp 28-61
19. Menné T, Wilkinson JD: Individual predisposition to contact dermatitis, in Rycroft RJG, Menné T, Frosch PJ, et al (eds):

*Dickel et al*

Textbook of Contact Dermatitis, ed 1. Berlin, Springer-Verlag, 1992, pp 123-130

20. Fisher AA: Contact dermatitis in black patients. Cutis 20: 303, 308-309, 316, 318-319, 322; 1977

21. Fisher AA: New advances in contact dermatitis. Int J Dermatol 16:552-568, 1977

22. Veien NK: Clinical features, in Rycroft RJG, Menné T, Frosch PJ, et al (eds): Textbook of Contact Dermatitis, ed 1. Berlin, Springer-Verlag, 1992, pp 153-204

23. Rudner EJ, Clendenning WE, Epstein E, et al: Epidemiology of contact dermatitis in north america: 1972. Arch Dermatol 108:537-540, 1973

24. Leyden JJ, Kligman AM: Allergic contact dermatitis: Sex differences. Contact Dermatitis 3:333-336, 1977

25. Goh CL, Soh SD: Occupational dermatoses in Singapore. Contact Dermatitis 11:288-293, 1984

26. Goh CL: Prevalence of contact allergy by sex, race and age. Contact Dermatitis 14:237-240, 1986

27. Rapaport MJ: Patch testing in Japanese subjects. Contact Dermatitis 11:93-97, 1984

28. Dickel H, Taylor JS, Bickers DR, et al: Patch testing with a standard series: Results from two clinics in Cleveland, Ohio (USA), and comparison with a West European clinic in Cologne, North Rhine-Westphalia (Germany). Dermatosen 46:234-243, 1998

29. Nethercott JR, Holness DL, Adams RM, et al: Patch testing with a routine screening tray in North America, 1985 through 1989: I. Frequency of reponse. Am J Contact Dermat 2:122-129, 1991

30. Nethercott JR, Holness DL, Adams RM, et al: Patch testing with a routine screening tray in North America, 1985 through 1989: II. Gender and response. Am J Contact Dermat 2:130-134, 1991

31. Nethercott JR, Holness DL, Adams RM, et al: Patch testing with a routine screening tray in North America, 1985 through 1989: III. Age and response. Am J Contact Dermat 2:198-201, 1991

32. Nethercott JR, Holness DL, Adams RM, et al: Patch testing with a routine screening tray in North America, 1987 through 1989: IV. Occupation and response. Am J Contact Dermat 2:247-254, 1991

33. Nethercott JR, Holness DL, Adams RM, et al: Results of first and second readings with standard screening tray in North America: 1985 to 1989. Am J Contact Dermat 2:255-259, 1991

34. Nethercott JR, Holness DL, Adams RM, et al: Multivariate analysis of the effect of selected factors on the elicitation of patch test response to 28 common environmental contactans in North America. Am J Contact Dermat 5:13-18, 1994

35. Fischer T, Maibach HI: Patch testing in allergic contact dermatitis: an update. Semin Dermatol 5:214-224, 1986

36. Witzig R: The medicalization of race: scientific legitimization of a flawed social construct. Ann Intern Med 125:675-679, 1996

37. Wilkinson JD, Hambly EM, Wilkinson DS: Comparison of patch test results in two adjacent areas of England. II. Medicaments. Acta Dermatovener (Stockh) 60:245-249, 1980

38. Storrs FJ, Rosenthal LE, Adams RM, et al: Prevalence and relevance of allergic reactions in patients patch tested in North America—1984 to 1985. J Am Acad Dermatol 20: 1038-1045, 1989

39. Rudner EJ, Clendenning WE, Epstein E, et al: The frequency of contact sensitivity in North America 1972–74. Contact Dermatitis 1:277-280, 1975

40. Rudner EJ: North American Group Results. Contact Dermatitis 3:208-209, 1977

41. Lynde CW, Warshawski L, Mitchell JC: Screening patch tests in 4190 eczema patients 1972–1981. Contact Dermatitis 8:417-421, 1982

42. McDonagh AJG, Wright AL, Cork MJ, et al: Nickel sensitivity: The influence of ear piercing and atopy. Br J Dermatol 126:16-18, 1992

43. Adams RM, Maibach HI: A five-year study of cosmetic reactions. J Am Acad Dermatol 13:1062-1069, 1985

44. Eiermann HJ, Larsen W, Maibach HI, et al: Prospective study of cosmetic reactions: 1977–1980. J Am Acad Dermatol 6:909-917, 1982

45. Kawakubo Y, Nakamori M, Schöpf E, et al: Acetylator phenotype in patients with p-phenylenediamine allergy. Dermatology 195:43-45, 1997

46. Schnuch A, Westphal GA, Muller MM, et al: Genotype and phenotype of N-acetyltransferase 2 (NAT2) polymorphism in patients with contact allergy. Contact Dermatitis 38:209-211, 1998

47. Kawakubo Y, Merk HF, Al Masaoudi T, et al: N-acetylation of paraphenylenediamine in human skin and keratinocytes. J Pharmacol Exp Ther 292:150-155, 2000

48. Meyer UA, Zanger UM: Molecular mechanisms of genetic polymorphisms of drug metabolism. Annu Rev Pharmacol Toxicol 37:269-296, 1997

49. Fukutome K, Watanabe M, Shiraishi T, et al: N-acetyltransferase 1 genetic polymorphism influences the risk of prostate cancer development. Cancer Lett 136:83-87, 1999

50. Parker LU, Taylor JS: A 5-year study of contact allergy to quaternium-15. Am J Contact Dermat 2:231-234, 1991

**EXHIBIT B**



# The New York Times

**SPORTS**

# Just for Men Just Right for Former Stars

TV Sports

By RICHARD SANDOMIR JAN. 6, 2008

It was (and is) cheesy, hokey, goofy, silly and evidently effective. It was a cri de coeur to men that their moribund love lives could be resuscitated with brush-in facial hair gel. It was the Just for Men advertisement with **Keith Hernandez** and **Walt Frazier** as barside analysts of Miss Hottie's brush-off of poor Mr. Graybeard.

"No play for Mr. Gray," Frazier said, as if the sap had just had his jumper blocked.

It lacked the snap, crackle and pop of "Tastes great, less filling" or the cinematic élan of Mean Joe Greene's Coca-Cola ad. But the original Hernandez-Frazier singles-bar pairing is still running after nearly five and a half years, outlasting a less-memorable follow-up — and still enriching two stars of graying age: Hernandez, 54, a Mets analyst for SportsNet New York, and Frazier, 62, MSG's lead Knicks analyst.

"People used to stop me in the airport and ask, 'Can I help you move?'" Hernandez said by telephone, alluding to his 1992 guest appearance on "Seinfeld." Now, he added, "They say, 'Rejected!'" a line that he and Frazier uttered in unison

PLAINTIFF'S EXHIBIT B

in the first ad.

Research showed Combe Inc., Just for Men's parent company, that its target male buyers are not tired of the ad. "It's so much a part of the vernacular," said John Lerch, Combe's chief advertising officer, worldwide. "The lines really play back."

And, he said, the over-the-top production eases the reluctance of hair-coloring virgins.

The Hernandez-Frazier announcing tandem returned Saturday night (on the Jaguars-Steelers playoff game on NBC) with a new ad with the former Dallas Cowboy Emmitt Smith. He is first seen in a retirement home for running backs, rendered morose by a gray beard that, if left to thicken and grow paler, would look like Fred Sanford's.

"Emmitt, your gray facial hair has put you in a rocking chair," Frazier says.

"Your beard is weird," Hernandez adds.

"Your 'stache is trash," Frazier chimes in.

"Oooh, it's bad," Smith moans. His bonus for coloring his beard is not a date (although cheerleaders celebrate his renewal) but a touchdown in the Orange Bowl.

"He scores!" Hernandez and Frazier say, once more as one, from the sideline.

(Take note, viewers: Hernandez's hair and mustache look especially black.)

Just for Men prefers that Hernandez's mustache be of a continually dark hue; the company does not mind if he keeps his hair dark, too, but his deal is strictly facial. Two executives have the additional corporate assignment of contacting him when they spot his color fading and suggest that it is time for a touch-up.

"During the season, I use it quite a bit," said Hernandez, the Mets' former first baseman. "I can't have gray."

Lerch said, "When we remind him, it's more like kidding him."

Frazier needs no such reminders from the home office in White Plains; he is so fastidious about hiding the encroaching gray. But in the off-season, invisible to his gel masters, Hernandez lets the gray show in the signature facial hair that was voted the top sports mustache ever last year by the American Mustache Institute.

E-mail: sportsbiz@nytimes.com

A version of this article appears in print on , on page 82 of the New York edition with the headline: Just for Men Just Right For Former Stars.

© 2016 The New York Times Company

**EXHIBIT C**

Emmitt Smith's Football Legacy: 18 Talking Points On His 'Just For Men' Commercial - SBNation.com  1/28/16, 9:50 AM

# SB★NATION

# Emmitt Smith's Football Legacy: Points On His 'Just For Men' Com

*By Jon Bois [1] @jon_bois [2] on Aug 7, 2010, 1:26p*



PLAINTIFF'S EXHIBIT
C
tabbies

O ver the course of 13 seasons in the NFL, **Emmitt Smith, who will enter the Pro Football Hall of Fame on Saturday evening** [4] , pieced together an absolutely magnificent career By the time it was over, he had amassed more rushing yards and touchdowns than any running back in history, as well as three Super

Bowl Rings.

Many overlook these numbers, because in the end, he's far and away most well-known for his Just For Men commercial.



The tale told within these thirty seconds has spawned hundreds of questions, but the general consensus is that the following 18 are the most pertinent. Read on.

**1.** This commercial seems like something Sartre might have written. After retirement, Emmitt Smith is relegated to the "Running Back Rest Home." The decor is 100% football-themed. The sign out front is supported by a goalpost. Photos of footballs populate the walls and shelves. There is a football-themed clock on the wall. How can these people be so one-dimensional?

**2.** On the secretary's desk sits a football-themed bucket that holds miniature footballs. Why? Are they complimentary? Perhaps they're meant for the residents, but I doubt that retired NFL running backs would have much use for or interest in a football that isn't regulation-

size, much less a dozen of them.

**3.** The secretary at the Running Back Rest Home is dressed as a cheerleader. She is even holding pom-poms. How can she reasonably expected to perform any duties required of a secretary?

**4.** Emmitt's only companion in the Running Back Rest Home appears to be a gentleman in a generic white football uniform. It initially seems plausible that he is merely a figment of Emmitt's imagination; however Keith Hernandez and Walt "Clyde" Frazier can see him. Perhaps they share his dreamlike visions?

**5.** The staff at the Running Back Rest Home went out of their way to place a decal of a football on Emmitt's rocking chair. That was very thoughtful of them, seeing as he himself once played football. I suppose this isn't really a question. Just making a note.

**6.** Frazier asserts that Emmitt's "gray facial hair has put [him] in a rocking chair." Is his health a function of the color of his beard? How is this so?

**7.** Hernandez bluntly tells Emmitt that his "beard is weird." There's nothing inherently "weird" about gray facial hair; in fact, you will see a dozen men with gray beards if you walk down the street for long enough. Perhaps Hernandez is perplexed by beards of all sorts, and was never told that a man can grow facial hair beyond the bounds of one's upper lip?

Emmitt Smith's Football Legacy: 48 Talking Points On His Just For Men Commercial - SBNation.com                    1/28/16, 9:50 AM

**8.** Frazier and Hernandez are holding microphones labeled, "JUST FOR MEN." Is there a Just For Men news network? In the age of the 24-hour news cycle, how can a network with such a small niche compete against the likes of CNN?

**9.** After applying Just For Men-brand products to his beard, Emmitt's

**SB★NATION**                                        TWEET                    SHARE

sport is he playing? It certainly isn't football. In football, there is more than one player on the field on any given play, and cheerleaders are generally forbidden from actually participating.

**10.** The fans cheer when Emmitt runs into the end zone. However, even by the admittedly tenuous nuances of whatever this "game" is, he has not scored a touchdown since he is not even holding a football. What *is* this game?

**11.** He is pursued by a team of cheerleaders; in fact, these appear to be the very same cheerleaders who cared for him in the rest home. Are they on the same team, or have they turned on him after Emmitt abandoned them?

**12.** At the 22-second mark, Keith Hernandez points and remarks, "Backfield in motion!" What is he referring to? What backfield? A backfield would imply a line of scrimmage, and a line of scrimmage would imply an offensive and defensive line. None of these are anywhere to be seen.

**13.** Late in the commercial, the rules of this "game" begin to reveal

themselves. Apparently, one can score simply by running into the end zone. How many more touchdowns could Emmitt have scored in the NFL had he not been required to carry the ball into the end zone? Probably dozens!

**14.** What is Emmitt saying at the end? At first it seems reasonable to assume that he is saying, "keep your edge," but this doesn't jibe with the tale we have just witnessed. If we can agree that "edge" is meant here to imply one's physical fitness, we can also agree that Emmitt did not keep his edge. In fact, he lost it, only to reclaim it after applying Just For Men-brand products to his beard. "Reclaim your edge" would have been more appropriate.

**15.** Frazier and Hernandez can't possibly be described as respectable journalists. In fact, this entire story has, in a sense, been one giant commercial for Emmitt Smith.

**16.** Why did the Just For Men Network send two correspondents to cover this story? While it's an industry standard to put two people with microphones in a broadcast booth, we generally don't see two reporters from the same network covering the same story at the same time.

**17.** On Saturday night, when Emmitt gives his Hall of Fame induction speech, the color of his facial hair will serve as a referendum on this strange, thirty-second-long fever dream. Did it really happen? What is its legacy?

**18.** The most telling observation can perhaps be made at the 27-second mark: save for a small gang of extras, the stadium is empty. In fact, over Emmitt's left shoulder, we can see a field of empty seats. This is strikingly reminiscent of the dream sequence at the end of Raising Arizona.



Was this whole story merely another of Nicolas Cage's dreams? In this day and age, what is not, and how can we tell?

[0] http://www.sbnation.com/nfl
[1] http://www.sbnation.com/authors/jon-bois
[2] http://twitter.com/jon_bois
[3] http://www.sbnation.com/2010/8/7/1610910/emmitt-smith-pro-football-hall-of-fame-inductio
[4] http://www.sbnation.com/2010/8/7/1610064/2010-pro-football-hall-of-fame-inductions-nfl-c

**EXHIBIT D**

# Keith Hernandez, Walt Clyde Frazier Announce Latest Venture

*By Kevin Flynn - 08/03/2015*



 SHARE     TWEET     REACT


PLAINTIFF'S EXHIBIT
D

PREV ARTICLE          NEXT /

NAVIGATE:

*On Monday morning, at Clyde's Wine & Dine in the heart of New York City, Keith Hernandez a "Clyde" Frazier made a big announcement.*

## By Kevin Flynn



On August 3, the "Just For Men: Mustache and Beard" production team held a p conference in the friendly confines of their famous spokesman's restaurant.

**Walt "Clyde" Frazier's Wine and Dine Restaurant** at 485 10th Avenue, New Yo was the venue and those invited received a chance to witness some of the class **Men's** commercials which pairs two of New York's greatest color commentators as the pitchmen.

The main event came when the company premiered their newest commercial which starts airir television today. It once again features the combo of Hernandez and Frazier, continuing marke nen who may be "rejected" by the ladies for having too much gray in their beards.

The rise of beards and mustaches on males, ages 21-40 in society, have been tabbed as the foc new Twitter campaign, #Beardspotting. The company will be holding a contest to search for th Beard by sharing pictures of men with beards on social media using the hashtag.



**Walt Clyde Frazier**
@WaltFrazier

Follow

@JustForMen #beardspotting had a Press conference at @ClydeFraziersWD about our return to their commercials.

11:24 AM - 3 Aug 2015

10     10

Hernandez eluded to having his mustache since he was 18 years old, and after recently shaving grew it back in support of the **New York Rangers** playoff run this past May.

Clyde Frazier was asked by one reporter, "In his opinion, who has the best beard in all of sports

stuck to his sport and gave the honor to James Harden, the Houston Rockets MVP candidate th
season. Frazier also said he'd help **Phil Jackson** and his broadcast partner during **New York Kn**
games, Mike Breen with their beards whenever they ask.

I was able to get one on one with Keith Hernandez, having the opportunity to ask a question:

Flynn: "With regard the Baseball Writers of America, who hold Baseball Hall of Fame votes; Do yo
they devalue the defensive attributes of first basemen when voting for the Hall of Fame?"

Hernandez: "Probably, it's shortstops and second basemen that get looked at more from a defer
angle to get into the Hall of Fame. The corner positions, they are looking for more home runs and
But you can make an argument one way or the other."

Flynn: "I keep looking at the list of Golden Glove award winners and I am amazed that you are th
guy at the top of that list for the most at his position that's not in the Hall. And it's not even clos
point that you are going to hold that record unless Mark Teixeira somehow plays another 6 seaso

Hernandez: "Teixeira's not gonna get there. Mattingly was the one, and he had nine and he hurt h
back. So Mattingly might have gotten more than me, but his career was curtailed with that bad b
situation."

Of course we all remember the classic Just For Men ads throughout recent memory from this u
duo:

"That beard is weird." "That stache is trash." Can't get enough.

[su_button url="http://elitesportsny.com/2015/08/03/new-york-giants-will-go-deep-victor-cruz/
target="blank" background="#000080" size="10" wide="yes" radius="0"]NEXT: Giants Changes
Cruz[/su_button]

**EXHIBIT E**



A Berkshire Hathaway Company



# Just for Men® Launches #Beardspotting Contest, a Nationwide Search for the "Best Beard Ever"

### Keith Hernandez and Walt "Clyde" Frazier Help Determine the Most Amazing 'Staches, Stand-Out Stubble and Winning Whiskers through Social Media

September 08, 2015 06:36 PM Eastern Daylight Time

NEW YORK--(BUSINESS WIRE)--Just For Men, the iconic Men's Hair Color brand, today announced the official kick-off of #Beardspotting, a brand new sport in search of the "Best Beard Ever." Led by New York sports legends and rhyming duo Keith Hernandez and Walt "Clyde Frazier," the contest invites people to upload their best beard and mustache photos for a chance to win prizes.

Starting today through September 30, consumers can enter by uploading photos of their beards or mustaches on Beardspotting.com to compete for the title of "Best Beard Ever." Keith and Clyde will provide "color commentary" and announce the winner on October 15, via Beardspotting.com and the brand's social channels. The winner will receive an all-expense-paid weekend trip for two to New York City in November to join the judging panel at The 2015 Just For Men National Beard & Moustache Championships in Brooklyn. In addition to the grand prize, entrants will have the opportunity to win Keith and Clyde autographed sports memorabilia daily.

"Beards are the ultimate badge of individuality for guys and we're eager to see the different entries," says Ralph Marburger, North American Category Director for Combe Incorporated's Just For Men brand. "With Keith and Clyde's help, we look forward to bringing #Beardspotting to the next level and announcing the 'Best Beard Ever' in October."

In August, Keith and Clyde announced #Beardspotting during a press conference where they also debuted the latest national TV spots that remind men that applying Just For Men in five easy minutes not only gets rid of gray, it makes beards look thicker and fuller.



PLAINTIFF'S EXHIBIT

E

To follow along with the contest and help Keith and Clyde determine the best beards in the nation, visit www.Beardspotting.com.

For additional information on Just For Men Mustache and Beard, visit www.JustForMen.com.

**About Combe Incorporated**

Combe Incorporated is a manufacturer of personal care products, including Just For Men®, Vagisil® intimate health care products, Sea-Bond® oral care products, Brylcreem®, Aqua Velva® and Lectric Shave® men's personal grooming products and Williams® Mug® Soap. Combe, a privately held multinational company founded in 1949, has its global headquarters in White Plains, N.Y.

# Contacts
M BOOTH
ASHLEY KRAYNAK, 212-481-7000
ASHLEYK@MBOOTH.COM

**EXHIBIT F**

# NewsTribune.com

Jump to content
Connect with the News Tribune

- ⚡Shop Local
- Obituaries
- HER Magazine
  - HER Magazine
  - HER Contests
- Advertise
- Contests
- Video
- Golden Hammer
- Goal Lines

- Facebook
- Twitter
- Alerts
- Feeds
- Mobile
- Pinterest
- Email

*Exceptional care* - all about you.    SSM Health Medical Group

News Tribune    AVAILABLE ON THE App Store    GET IT ON Google play

## 'Just For Men' Hair Dye Users Report Allergic Reactions

### Sometimes a little gray hair isn't the worst thing that can happen to you

Daryl Nelson of ConsumerAffairs

Tuesday, October 23, 2012

- Favorite story Your favorited articles
- Discuss Comment, Blog about
- Like ⟨ 22 ⟩    Tweet    Share

Let's face it, time really goes fast. One second you're ten years old running around with the neighborhood kids, and the next thing you know you're running to a local drug store to purchase hair dye.

For men who are going or have already gone completely gray, Just For Men has been a popular go-to for around 25 years, as its parent company Combe Incorporated introduced the hair coloring product in 1987.



In recent years Just For Men has received a pretty big advertising push from famous celebrities like ex-baseball star Keith Hernandez and basketball hall of famer Walt Frazier--and when you think of hair coloring for guys, Just For Men is arguably the first product many consider using.

But, as with other products and services, consumers aren't always happy with their first choice. Many consumers have posted on ConsumerAffairs about horrible symptoms like chemical burns on the skin, severe itching and painful blisters.

**Swelling & burning**

Take Sean of Brockton, Mass. who said that after trying Just For Men he had a severe reaction that caused facial swelling and painful burning.

"I applied the beard dye as detailed in the directions," he wrote in our comments section.

"I had a burning sensation as well, and after rinsing it off, I thought I was fine. The next day, my face and neck had swollen up horribly. The following morning my skin had begun to weep as well, and I went to the ER. I was admitted immediately, as it looked horrible. They were concerned about my throat swelling shut. I am nearly 50 and do not have any allergies that I know of. Whatever is in this stuff is harsh. I needed steroids and Benadryl," Sean detailed.

Of course one could have an allergic reaction to just about any product on the market, but the fact that a slew of our readers experienced the exact same reaction is telling, and some of them have used the product before with no problems until very recently.

Just For Men is made with a bunch of hard to pronounce ingredients like Erythorbic, Ethoxydiglycol, Trisodium, with several other additives, and some of our readers suggest there was a recent change in the product's ingredients, because many have only received these harsh reactions recently.

"Recent chemical formula change—there must have been a change with the beard color chemical formula," suggested J of Marietta, Ga. "I've been using it for over 10 years with no problems and in the past couple of weeks whenever I use it, there is a burning and itching. I'm going to switch to something less harsh," he wrote.

On the Just For Men website, it does suggest that users could have a bad reaction to the dye in the frequently asked questions section. It also says each person should do an "allergy patch test" to see if they'll experience some of the negative outcomes that a portion of our readers have experienced. Here's what the website reads:

"You must do this patch test on the inside bend of your elbow 48-hours ahead of each and every use in order to minimize the risk of an allergic reaction. With mild soap and water, wash an area about the size of a quarter on the inside bend of your elbow. [Then] pat dry."

"Unscrew the caps from the Color Developer and the Color Base tubes. Mix small, equal parts of the Color Base and the Color Developer in the mixing tray with the plastic end of the brush. Tightly recap both tubes. Apply mixture with a cotton ball or swab to a test area the size of a quarter on the inside bend of your elbow. Allow to dry."

"Examine the test area during the next 48-hours. If you get no reaction on the unwashed patch test site after 8-hours, go ahead with full application of Just For Men."

Just to get a little more detail on not only the patch test, but the ingredients of Just For Men, we phoned the company and spoke with a representative named Camille, and she immediately stressed the importance of the allergy test before using the hair dye.

After asking Camille if there has been a recent ingredient change in Just For Men, she said there hasn't been a change in quite some time.

"There has not, not in about seven years," she said. "What the readers or the bloggers are not saying is, even if they are long time users, it is definitely stressed and recommended highly that they always do a 48-hour allergy patch test, due to the fact that body chemistry can change at any one given time. Many of them ignore it and don't do it."

Camille also said she would have an official company spokesperson contact ConsumerAffairs, and we're still waiting for that response.

**Medical advice**

The instructions on the site also say if one does have a negative reaction to Just For Men, they should immediately washout the dye with shampoo and discontinue using it. The company also says to get medical advice before using its product or any other dyes.

What's interesting about the product warning is that the company pretty much anticipates the same negative symptoms many of our readers experienced, which shows Just For Men is aware of the potential harms.

"Rapidly spreading skin rash, dizziness, faintness, difficulty breathing, shortness of breath, tightness of chest, hives or swelling to eyes/face, blistering of skin or scalp weeping, seek immediate medical attention," the warning reads.

For those who experience a bad reaction to the dye, consumers should mail in the entire bottom flap of the box that contains the UPC code. They should then list their name, address and the price paid for the product to: Combe Incorporated, International Haircolor Specialist, 1101 Westchester Avenue, White Plains, NY 10604.

However sending the product back and getting a refund probably won't satisfy those who have suffered a lot of pain and discomfort like our reader Sean, who had to go the emergency room. Furthermore, if there is such a strong risk that people can be truly harmed by this product, is it even worth using it?

And even with the patch test, do you really want to expose any portion of your body just to see if the dye is usable?

Hey, sometimes looking good is associated with a small amount of discomfort, ask any female who had to endure uncomfortable shoes to complete an ensemble or a guy who has been choked by a necktie just to fit into the corporate way of dress--but looking a little more youthful shouldn't risk your very well-being, right?

It's apparent that men should think long and hard about using such dyes, and should maybe even speak to their doctors before using Just For Men or other products like it. Another thing men can do as they are greying is just embrace looking older if possible.

But for those who would rather postpone it than embrace it, the research you do before using Just For Men is a huge and crucial part of the dyeing process. Consumers should really be on guard.

**EXHIBIT G**

*Search this blog ...*

Search by keyword, author name, or title



# Lenox and the Second City

About    Archive    Subscribe by Email

Welcome to **ChicagoNow**.

**Meet** our bloggers, **post** comments, or **pitch** your blog idea.

Sign in    Pitch your idea

# The Black Man and his Beard

G+1   1     Tweet    2     Like    Share   32

View 1 Comment

*By* **Lenox Magee**, *October 30, 2015 at 10:01 am*

It's no secret that there is something about a beard that exudes power and virility. The whiskered look is definitely enjoying quite the resurgence; especially within the African American community. We have officially entered the era of the "bearded black guy." Many have judged this "new black" guy look as intelligent, sexy, ambitious, employed and well kept. And, perhaps, we should include patient to that list, too. The "bearded black guy" is no longer assumed to be of faith or street roots but moreso a man of substance. There's no doubt that the bushy long beards on African American men are a new style of this decade.

But, if you're like me, you're wondering where did this begin? How this become a "thing" in the African American community? For answers, I sought out a Master Barber Educator – yes, that's a real thing. A master barber training curriculum includes all the usual barber aspects of hair cutting, coloring and styling using tools like shears, razors and clippers. What makes a master barber different than your standard barber is mostly due to experience, expertise and a quality of service that sets the regular barbers apart from the master barbers. They have mastered most men's hairstyles and hair services, and have a more proficient level of skill in the barbering arts and sciences. Also, standard barber technicians may not be trained, licensed and permitted to perform certain services, whereas a master barber is.

Master Barber Educator Ray Richmond of Success Barber School in Chicago revealed that the "bearded black guy's" origin is hard to trace.



$4.49 Sq ft

Shop

Porcelain Tile - Moderna Collection Bisque / 12"...

## MEET THE BLOGGER



### Lenox Magee

Lenox Magee is a freelance journalist and blogger in the Chicagoland area.

## SUBSCRIBE BY EMAIL

ex: john@hotmail.com

Create Subscription

Completely spam free, opt out any time.



PLAINTIFF'S EXHIBIT
6

"The beard predates any written words," he said. "The origin and practice of shaving is difficult to determine when the form of hair removal and styling began. But, the '70s may be the premier facial fuzz decade of all time probably thanks to all the residual hair leftover by the hippies of the 60s."

Some scholars have argued that the marking of the beard is officially a symbol of the 19th Century American oppression of women and black men. In The *Atlantic's* "The Racially Fraught History of the American Beard" piece, the story examined the current fascination with facial hair, alongside its previous revival in the 19th century. Before the beard's reemergence in the mid-1800s, and after the American Revolution, there was a period when African-American men actually dominated the barbering job market. Thousands of former slaves were foisted upon a market that offered them little in the way of employment. One of the few jobs that represented hope for them was barbering. Black men became quite prosperous working as barbers and, unfortunately, this did not sit well with many privileged white men of the time. By 1850, American elites had abandoned black-owned barbershops in droves, and many African-American men began to view barbering as a dead end career. Early on there was resistance to this new beard trend—many felt that a beard was the mark of "maniacs, fanatics, and dissimulators." But by the late 1860s, the trend had stuck. It was then that white males claimed that beards were actually the mark of a superior race. Faced with threats to their prerogative, grew beards 'to codify a distinctly male appearance when other traditional markers of masculinity were no longer stable or certain.'

Richmond feels that the "bearded black guy" historical history forgot to include the medical condition that happens to black men when they shave too frequently. It's called Psuedofolliculitis Barbae, also known as the barber's itch, and, it can produce razor bumps, scarring of the beard and shave bumps with persistent irritation caused by shaving.

"Particularly, improper shaving or broken hair below the skin surface, which is prone in African ethnicity," he said. "Based on our skin, we can't shave all the time. So, we had to grow our beards to prevent the 'barber's itch.'"

The internet is littered with articles that ask the question: how to grow a beard like Rick Ross or James Harden. Rappers and Hip-Hop artist have a long history sporting magnificent beards, so it's no surprise that one of the trendiest styles comes to us direct from the music industry. Although it's not the look I fancy, I would be remiss if I didn't mention that guys such as Rick Ross have helped to move along the "bearded black man" spectrum - his beard has always been a part of his image. Black men have several styles of beards to choose from that are extremely popular right now. The goatee loved by some black men but some prefer the Rick Ross, which is gaining a lot of traction in Chicago.



Like Page    Share

Be the first of your friends to like this



## LATEST ON CHICAGONOW

### Super duds of the Super Bowl
from **Six Pack** by Timothy Ahrens
posted today at 3:38 pm

### Let's Help Our Students Ask the Important Questions About College
from **The College Scoop** by Pauly
posted today at 2:53 pm

### We got a scammy mortgage letter in the mail
from **Running With A Book Cart** by Holly
posted today at 2:38 pm

### Chillin' With a Safe Humane Chicago Court Case Dog and Talking Pit Bulls
from **To the Rescue!** by Laura Young
posted today at 2:34 pm

### Heinz Loses Chicago in Super Bowl Ad
from **Hot Dog Diaries** by Mark Andel
posted today at 2:33 pm

## POSTS FROM RELATED BLOGS



**Shades of Gender**
**Most recent post:** Do You Love Fashion?



**Trans Girl at the Cross**
**Most recent post:** The Locker Room: A unique place to find confidence in myself

*More from Lifestyle: GLBT*

With many guys begging to know how to grow a Rick Ross beard, it's truly an art to grow an impressive beard, and while not every man can manage the heady style (including myself), Richmond feels that the main reason why the beard/mustache was important in the Black Community was for social status across all cultures.

"Prominent figures of the community wore facial hair during the civil rights era," he said. "Richard Pryor, Dr. King, Billie D. Williams, Julius Erving are all men with beards and that represented wisdom and manhood. The beard is considered a sign of patience, strength, virility, and sexual prowess. Our community leaders had a beard and mustache to exude power."

It's no surprise that social media has taken a hand in the "bearded black guy" epidemic. Bearded and Black, a Tumblr page filled with black men sporting the scruffy look. And it's not just the beards purists I'm digging, but these dudes are also serving up some serious style. On Instagram, Black Men With Beards promises to uplift, empower and support black men in owning their bodies and their image, while defying stereotypes.

The scruffy fashion statement in the Black community seems to change meaning given the political climate in the world. In the '60s and '70s it was a symbol to show power and leadership. For the Black millennial, it's a statement of style, sexiness and strength. Given the plight of today's Black man, the beard could symbolize a movement for justice and civil rights. While my DNA prohibits me from joining the beard movement, I'd like to think that my little stache shares the same message.

◄ Previous    1/62    Next ►

## READ THESE CHICAGONOW BLOGS



**Becoming Nikki Lynette**
Musician & self-proclaimed "bad ass" Nikki Lynette shares her opinionated thoughts on real life, pop culture, & everything in between.

- **10 things my White friends BETTER NOT ruin during Black History Month**



**Bend Into Shape**
A regular dose of flow in a sticky world.

- **10 Reasons Why Mondays are the Best Day of the Week**



**Chicago's Real Law Blog**
Chicago's Real Law Blog has been keeping readers informed and "in the know" on hot legal issues via up-to-date blog posts from an experienced Chicago attorney.

- **How Not To Ruin Your Super Bowl Party**

## READ THESE CHICAGONOW BLOGGERS



Chi McFly Girl
from **Released to Crew Rest:**
I'm Running Away to Mexico (Again)



Howard Moore
from **I've Got The Hippy Shakes:**
January was a bad month for musicians



Neffer Kerr
from **It's The Boom Show:**
How Chicago State University Saved My Life and Helped Me Shed the Single Mother Stereotype





iel Marshall shows off his bushy beard.



*Filed under: Uncategorized*

*Tags: African-American beard, African-American men, Bearded and Black, bearded black guy, beards, Billie D. Williams, black men, black men with beards, Dr. King, Julius Erving, master barber, mustache, Richard Pryor, rick ross, rick ross beard, scruffy fashion, The Atlantic, The Racially Fraught History he American Beard*